IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS L. BAUER, M.D. | : | Civil No. 1:15-cv-1092 |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | |
| | : | |
| WELLSPAN MEDICAL GROUP | : | |
| | : | |
| **Defendant.** | : | Judge Sylvia H. Rambo |

# M E M O R A N D U M

In this employment discrimination action, Plaintiff alleges that his former employer discriminated against him because of his age by not renewing his contract and terminating his employment in violation of the Age Discrimination in Employment Act. Presently before the court are Defendant's motion for summary judgment and Plaintiff's motion for leave to file an amended complaint. For the reasons stated herein, Plaintiff's motion to amend his complaint will be denied and Defendant's motion for summary judgment will be granted.

## I.    Background

In considering the instant motions, the court relied on the uncontested facts, or where the facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to the nonmoving party.

### A.    Facts

Defendant Wellspan Medical Group ("Wellspan" or "Defendant") is a Pennsylvania non-profit, non-stock corporation with its sole member being

Wellspan Health. (Doc. 27-2, p. 2 of 94.) Wellspan Health is also a non-profit, non-stock corporation and a health care provider. (*Id.*) Dr. Thomas McGann ("Dr. McGann") was President of Wellspan at all times relevant to this matter. (*Id.* at 69-70 of 94.)

Plaintiff Thomas L. Bauer, M.D. ("Plaintiff") is a board certified general surgeon specializing in breast cancer surgery. (*Id.* at 10 of 94.) He was employed by Apple Hill Surgical Associates ("Apple Hill") from August 1970 through December 2008, when he retired pursuant to the practice's mandatory retirement policy which required all physicians to retire at age seventy. (*Id.* at 19-20 of 94.) Upon retiring from Apple Hill, Plaintiff joined Wellspan as a breast cancer surgeon on December 18, 2008. (*Id.* at 16 of 94.) At the commencement of his practice, the parties executed a Professional Services Agreement ("the Agreement") under which Wellspan Medical Group agreed to employ Plaintiff at a base salary of $275,000 per year for an initial two-year period. (Doc. 27-2, pp. 51-063 of 94.) After that, Plaintiff's contract would renew automatically for one year periods, unless either party decided to terminate the contract prior to the renewal date. (*Id.*) The Agreement included a list of Plaintiff's required duties and responsibilities, which required, Plaintiff to "conduct his . . . activities in accordance with the conduct expected of all professionals who participate in the care of patients . . ." and "to consistently treat employees and patients in a professional, respectful

manner." (*Id.*) The Agreement also directed Plaintiff not to remove any of Wellspan's or York Hospital's medical records from the hospital. (*Id.*) Additionally, the Agreement required Plaintiff to divest his shares in Apple Hill Surgical Center Partners, LP, a company that owned a controlling share in Apple Hill Surgical Center, within twenty-four months of employment. (*Id.* at 11-12, 51-63 of 94.) Although Plaintiff initially objected to this provision, he signed the Agreement. (*Id.* at 71-72 of 94.)

Pursuant to the Agreement, Wellspan leased office space for Plaintiff's practice in a medical suite owned by Dr. Marsha Bornt ("Dr. Bornt") located within the Apple Hill Health Campus in York, Pennsylvania. (*Id.* at 23-24 of 94.) Dr. Bornt is the sole proprietor of Apple Hill Gynecology and not employed by Wellspan. (*Id.* at 90 of 94.) Defendant hired three staff members to assist Plaintiff with his practice: Gale Bowman, a nurse; Lori Bowman, a medical secretary; and Norma Hull ("Ms. Hull"), a transcriptionist. (*Id.* at 19-22 of 94.)

In February 2011, while at the office, Plaintiff and Lori Bowman got into an argument. (*Id.* at 17-18 of 94; Doc. 27-3, pp. 10-13 of 85.) According to Plaintiff, he wanted to leave the office to meet his wife, but Lori instructed him that he had to finish dictating his charts or else she would count his time out of the office as unpaid time off. (Doc. 27-2, p. 17 of 94.) Considering Lori to be out of line, Plaintiff responded stating, "[Y]oung lady, who are you talking to? Who do you

3

think you are talking to?" (*Id.* at 17-18 of 94.) Plaintiff then went to his office and contacted Dr. Ronald Hempling ("Dr. Hempling"), Vice President of Defendant's Surgical Oncology Service Line, to ask whether Lori's behavior was appropriate. (*Id.* at 17 of 94; Doc. 27-3, pp. 12-13 of 85.) While on the phone with Dr. Hempling, Gale Bowman entered Plaintiff's office to intervene on Lori's behalf. (Doc. 27-2, pp. 17, 18, 25 of 94; Doc. 27-3, pp. 12-14, 17-20 of 85.) In response, Plaintiff held up the phone and said to Dr. Hempling: "[Y]ou want to know what I'm going through? Listen to this bitch screaming at me." (Doc. 27-2, pp. 25-26 of 94; Doc. 27-3, pp. 12-13, 17-20 of 85.) In an attempt to diffuse the situation, Dr. Hempling promptly met with Plaintiff and the three staff members. (Doc. 27-2, p. 18 of 94.) Following that meeting, Debra Kleyhauer ("Ms. Kleyhauer"), Administrative Director for Defendant's Oncology Service Line, verbally counseled Plaintiff that his behavior "was inappropriate and unprofessional" and warned him "that it [would] not be tolerated." (*Id.*; Doc. 27-3, pp. 14,  21 of 85.) Plaintiff disagreed that his behavior was inappropriate, explaining, "I didn't directly call her a bitch. I said listen to this bitch screaming at me." (Doc. 27-2, p. 26 of 94.) Plaintiff later acknowledged that his statement was not "the most professional thing." (*Id.*)

Several months later, Wellspan and Plaintiff amended the Agreement. While Plaintiff's compensation and duties remained the same, the automatic yearly

renewal clause, which the parties referred to as the Evergreen Clause, was replaced with a specific term indicating that Plaintiff's employment "shall terminate on December 31, 2014, unless terminated sooner pursuant to the terms of th[e] Agreement." (Doc. 27-3, p. 34 of 85.)

The parties dispute the circumstances surrounding the amendment. Plaintiff had not divested his shares of Apple Hill Surgical Partners, LP, even though he had contractually agreed to do so within twenty-four months and had been working for Wellspan for almost three years at that point. (Doc. 27-3, p. 32 of 85.) On October 21, 2011, Dr. McGann sent Plaintiff a letter demanding that he comply with his contractual obligation. (*Id.*) In response, Plaintiff approached Dr. McGann and requested that Wellspan replace the Agreement's Evergreen Clause with a three-year-term ending on December 31, 2014. (Doc. 27-2, pp. 76-78 of 94.) According to Dr. McGann, Plaintiff explained, "I have to work until I'm 75." (*Id.*) Apparently Plaintiff had certain financial obligations which he wouldn't be able to satisfy if he divested his interest in Apple Hill Surgical Center Partners, LP and, therefore, he needed assurance that he would continue to work until he reached 75 years old. (*Id.*) He did not want the Evergreen Clause in his contract, which Plaintiff described as "too risky." (*Id.*) Dr. McGann agreed to amend the Agreement, and on February 15, 2012, Plaintiff finally sold his shares in Apple Hill Surgical Partners, LP. (*Id.* at 65-66 of 94.)

Plaintiff provides a different story of these discussions. He admits that he approached Dr. McGann about a three-year contract in response to Dr. McGann's insistence about selling his shares. (*Id.* at 13-14 of 94.) But, according to Plaintiff, his understanding was that his contract would begin renewing automatically each year again after the expiration of the three-year-term. (*Id.*) When Dr. McGann presented the proposed amendment, Plaintiff immediately noticed the missing Evergreen Clause and asked Dr. McGann, "Where is the Evergreen Clause? I'm not signing this." (*Id.* at 14-15 of 94.) Plaintiff claims that Dr. McGann responded, "By God, Tom, you're going to be 76 year old at that time." (*Id.*) Dr. McGann also allegedly stated: "I want to plant a seed in your head. And I want you to think about renegotiating your contract for 2015 at least so you can continue teaching and doing all your research with Wellspan." (Doc. 35-2, p. 4 of 70.) Dr. McGann denies making either statement.

Regardless, Plaintiff ended up signing the amendment as presented. (Doc. 27-2, p. 16 of 94.) When asked why he signed the amendment without the Evergreen Clause, Plaintiff responded "I don't know." (*Id.*)

Meanwhile problems continued at Plaintiff's office. Kathy Shields Eberly ("Ms. Shields Eberly"), Dr. Bornt's office manager, recalled in her deposition that Gale Bowman often complained about the way Plaintiff treated her and

occasionally cried during these conversations.[1] (*Id.* at 37 of 85.) Ms. Shields Eberly shared an office space with Gale and heard Plaintiff yell at his staff in front of patients and say negative things about Wellspan to his patients. (*Id.*) At some point, she spoke with Dr. Bornt about these issues and noted that Apple Hill Gynecology patients were sometimes present when Plaintiff acted in this manner.[2] (*Id.*; Doc. 27-2, pp. 90-91 of 94.)

On August 16, 2013, Gale  was assigned to work in the Radiation Oncology Department because Plaintiff was not scheduled to see any patients and the radiation department was short staffed. (Doc. 27-3, p. 41 of 85.) Plaintiff's other staff members were out that day so no one was available in his office to answer the telephone. (*Id.* at 22, 41 of 85.) With the permission of Ms. Kleyhauer, Gale forwarded the calls to the Radiation Oncology Department. (*Id.*) If Gale was not available to take the call, the call was sent to the voicemail for Plaintiff's office

---

[1] Throughout Plaintiff's response to Defendant's statement of facts, Plaintiff asserts that the affidavits of several individuals presented by Defendant are inadmissible as hearsay and conclusory testimony. (*See, e.g.*, Doc. 33, ¶¶ 32, 34-38, 69, 72.) Federal Rule of Civil Procedure 56 specifically permits the use of affidavits to support facts in summary judgment motions as long as the affidavit is made "on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(1)(A), (c)(4). The court is satisfied that the affidavits provided by Ms. Shields Eberly, Dr. Bornt, and Dr. McGann meet the criteria set forth in Rule 56. Furthermore, Plaintiff plainly states that nearly every statement in the affidavits is hearsay, but provides no further argument. (*See* Doc. 33.) The court finds that the statements contained in the affidavits are not hearsay pursuant to Federal Rule of Evidence 801.

[2] Dr. Bornt avers that following this discussion, a meeting took place between herself and Plaintiff to discuss his behavior. (Doc. 27-2, p. 91 of 94.) However, Plaintiff argues that this meeting never occurred. (Doc. 33, p. 3.)

and checked every thirty minutes. (*Id.*) That morning, York Hospital's Imaging Department needed Plaintiff's input prior to operating on a patient. (Doc. 27-2, pp. 28-29 of 94.) Staff at the York Hospital Imaging Department attempted to reach Plaintiff at his office and, when unsuccessful, called Plaintiff on his cell phone and mentioned that his office phone was not being answered. (*Id.*) Plaintiff proceeded to call his office twice to determine why the phone was not being answered but each time the receptionist answered, "Radiation Oncology." (*Id.* at 30 of 94.)

After completing an operation, Plaintiff returned to his office—in his words—"very, very angry" and "may have used some language that wasn't very nice."[3] (*Id.* at 30-31 of 94; Doc. 27-3, p. 23 of 85.) Gale began crying as a result of this interaction. (Doc. 27-2, p. 30 of 94; Doc. 27-3, p. 36 of 85.) Plaintiff claims that he was angry with Wellspan, not at Gale, for reassigning her to Radiation Oncology. (Doc. 27-2, p. 31 of 94.) Gale, however, testified that his anger was directed at her. (*Id.* at 30 of 94; Doc. 27-3, p. 23 of 85.)

In response to this event, Ms. Shields Eberly went to Dr. Bornt and threatened to quit unless Dr. Bornt ended Plaintiff's lease in the shared office suite. (Doc. 27-2, p. 91 of 94; Doc. 27-3, p. 38 of 85.) As Ms. Shields-Eberly explained, "I have been working with physicians for over 40 years now, and I feel that [Plaintiff] was the most unprofessional physician I have ever worked with." (Doc.

---

[3] Gale Bowman testified in her deposition that Plaintiff "screamed, yelled and cursed at [her] on the phone that other nurses in Radiation could hear him." (Doc. 27-3, p. 23 of 85.)

27-3, p. 38 of 85.) Concerned about her staff quitting and the effect Plaintiff's behavior would have on Apple Hill Gynecology, on August 19, 2013, Dr. Bornt sent a letter to Defendant terminating the lease for space in her office suite in ninety days. (Doc. 27-2, p. 91 of 94.)

Dr. McGann was made aware of the August 16, 2013 incident the day it occurred. He received reports that Plaintiff was "extremely angry," "verbally abusive," and "us[ing] obscenities, including the F word," and that "people were in tears." (*Id.* at 74-75 of 94.) He was further told that the incident did not occur in private but was "overheard by staff of [Dr.] Bornt's office." (*Id.* at 75 of 94.) The information was "of such a disturbing nature" that Dr. McGann met with Plaintiff about it immediately. (*Id.*) Dr. McGann scheduled another meeting a week later, after Dr. Bornt officially terminated the lease, and provided Plaintiff with a "formal first and final written warning." (*Id.* at 27, 74 of 94; Doc. 27-3, p. 45 of 85.) This warning letter required Plaintiff to "behave in a professional, respectful, gracious and courteous manner," and to "behave in strict accordance with the WellSpan Medical Group provider compact." (Doc. 27-3, p. 45 of 85.) Plaintiff was also required to self-refer to Defendant's employee assistance program for anger management counseling. (*Id.*) The letter also clearly indicated the consequences of Plaintiff's failure to fulfill these expectations, stating: "Should any behavior occur that does not meet the expectations listed above, you will be

subject to immediate termination. In addition, any actions that are perceived as retaliatory toward staff will have the same consequence." (*Id.*) Finally, the letter described Dr. Bornt's decision to terminate the lease as "both an embarrassment to our organization and a great disservice to our patients." (*Id.*)

On September 3, 2013, Plaintiff sent Dr. McGann a letter responding to the warning letter and providing his own explanation of the August 16, 2013 incident. (*Id.* at 47-48 of 85.) Although Plaintiff believed that his staff "had failed" him, he claimed that his frustration was with Wellspan only and that, "[a]ny suggestion that I had 'blown my top' and was berating my nurse is a complete fabrication and can only mean you were given bad information." (*Id.*) Plaintiff added: "I presume that your letter of August 23 is in no way related to my earlier request for an extension of the term of my current contract past the end of the calendar year 2014. . . . At any rate, my age appeared to be a sensitive issue for you." (*Id.* at 48 of 85.) On September 30, 2013, Dr. McGann responded to Plaintiff's letter with "shock[] at the tone and insinuations contained in [the] letter," including Plaintiff's suggestion that "the reprimand was a thinly veiled attempt at ageism." (*Id.* at 50 of 85.) Dr. McGann noted that he had seriously considered terminating Plaintiff's employment in response to the August 16th event, and urged Plaintiff to "reconsider the responsibility that you have for the situation in which you now find yourself." (*Id.*)

After relocating Plaintiff's practice to a new location on Bannister Street in York, Pennsylvania (hereinafter "Bannister Street office"), Dr. McGann received reports that Plaintiff was copying patients' records and having inappropriate conversations with patients. (Doc. 27-2, p. 94; Doc. 27-3, p. 8-9 of 74.) Dr. McGann and Karen Stough ("Ms. Stough"), Senior Practice Manager for Wellspan Surgical Oncology, met with Lori, Gale, and Kristina Mahone ("Ms. Mahone"), who replaced Ms. Hull upon retirement, at the Bannister Street office on October 15, 2013. (Doc. 27-2, p. 85 of 94; Doc. 27-3, p. 4-5 of 85.) During this meeting, Lori and Gale complained that Plaintiff had become increasingly difficult to get along with over the past several years. (Doc. 27-3, p. 52 of 85.) Lori stated that Plaintiff talked negatively about Wellspan to patients, claiming that Wellspan was out to get him and blaming the staff for his office relocation. (*Id.* at 6-9, 53 of 85.) The staff reported that patients appeared confused after these interactions with Plaintiff. (*Id.*) Although Gale and Lori complained that Plaintiff often approached them in the hallway with a raised voice and put his finger in their faces, they admitted that Plaintiff lost his temper less frequently and stopped using profanity in the office after receiving the warning letter. (*Id.* at 53 of 85.) All three women indicated that they feared Plaintiff would retaliate against them for complaining about his behavior. (*Id.*; Doc. 27-2, pp. 87-88 of 94.)

Dr. McGann and Plaintiff also had a meeting on October 15, 2013, at which time Plaintiff denied everything that his staff said about him. (Doc. 27-3, p. 54 of 85.) Plaintiff also denied discussing his warning letter, or disparaging Wellspan in any way to patients, and stated that he told patients that the practice moved to the Bannister Street office because it was cleaner and larger. (*Id.*; Doc. 27-2, p. 35 of 94.) He further claimed that his staff was setting him up in order to remove him from practice. (Doc. 27-2, p. 38-39 of 94; Doc. 27-3, p. 54 of 85.) Based on these discussions, Dr. McGann instructed Plaintiff to limit his conversations with patients to clinical issues and not to mention Defendant or retaliate against the staff in any way, and Plaintiff agreed. (Doc. 27-3, p. 54 of 85; Doc. 27-2, p. 39 of 94.)

However, on April 15, 2014, Lori and Gale complained to Ms. Stough that they had been receiving threatening and harassing phone calls from Plaintiff and expressed concerns about working with him. (Doc. 27-3, p. 57 of 85.) They also alleged that Plaintiff had been copying every patient's "face sheet," a portion of the patient's medical record containing the patient's contact information and treatment summary.[4] (*Id.*) According to Gale and Lori, Plaintiff was telling patients that Wellspan was firing him and that they should "google" him to find out where he is practicing to make their appointment for the following year. (*Id.*) These allegations

---

[4] Plaintiff asserts that he has always copied face sheets, which is a portion of the patient's record, for research purposes and this was known to Defendant. (Doc. 33, ¶ 63.) Defendant avers that Plaintiff removed the face sheets without Defendant's permission. (Doc. 27, ¶ 99.)

concerned Dr. McGann as Plaintiff's Agreement contained both a non-solicitation clause, prohibiting Plaintiff from soliciting Wellspan patients, and a non-competition clause, prohibiting Plaintiff from servicing patients in York and Adams counties during the two-year period following the end of his employment with Wellspan. (*Id.* at 52-55 of 85; Doc. 27-2, pp. 55-57 of 94.)

In May 2014, Plaintiff met with Dr. McGann to discuss notifying patients about the end of his employment with Wellspan. (Doc. 27-2, p. 79 of 94.) The meeting was attended by Plaintiff; his wife, Paula Bauer; Dr. McGann; Dr. Douglas Arbittier ("Dr. Arbittier"), Vice President of the Oncology Service Line; and Rick Ayers ("Mr. Ayers"), a public relations official for Defendant. (*Id.*) Dr. McGann, Dr. Arbittier, and Mr. Ayers presented Plaintiff with several proposed letters which praised Plaintiff for his long career and indicated that he would be retiring on December 31, 2014. (*Id.* at 81-82 of 94.) Plaintiff presented his own proposed letter to patients containing language that he would continue to practice in his specialized field of breast only surgical oncology, and that a formal announcement of his new office and affiliations would be available shortly after his separation from Wellspan. (*Id.* at 41 of 94; Doc. 27-3, p. 60 of 85.) Dr. McGann dismissed using Plaintiff's letter as he believed that the letter ignored the Agreement's non-competition and non-solicitation provisions. (Doc. 27-2, pp. 83-84 of 94.) Dr. McGann recommended that they collaborate in writing a letter so

that Plaintiff's patients would be notified of his leaving and Defendant could recognize his years of service. (*Id.* at 82-83 of 94.) It was explained that if Plaintiff would not agree to co-authoring a letter, Defendant would provide patients a letter without Plaintiff's signature. (*Id.* at 82-84 of 94.) Dr. McGann explained, if they did not issue a joint letter, "things can get ugly," in reference to the impact the refusal to co-author a letter could have on Plaintiff's reputation and if Plaintiff violated the non-competition and non-solicitation clauses of the Agreement. (*Id.* at 83-84 of 94.) Plaintiff and his wife perceived this statement as a threat. (Doc. 33-2, p. 4 of 38.) Ultimately, Plaintiff refused to co-author a letter and the meeting ended. (Doc. 27-2, p. 84 of 94.)

On July 14, 2014, Plaintiff was scheduled to see patients for follow-up appointments. (Doc. 27-3, pp. 24-25, 64-65 of 84.) Ms. Stough assigned Samantha Anthony ("Ms. Anthony"), a patient care assistant, to work in Plaintiff's office to fill in for Gale who was out that day. (*Id.*) After her shift ended, Ms. Anthony approached Ms. Stough with some concerns regarding Plaintiff's behavior. (*Id.* at 66-67 of 85.) Ms. Stough asked Ms. Anthony to put her concerns in writing. (*Id.* at 67, 69-70 of 85.)

In an email sent later that evening, Ms. Anthony indicated that the first patient's visit began fine but that Plaintiff became confused when using Wellspan's electronic medical record system. (*Id.* at 69-70 of 85.) Plaintiff told the patient that

the system was "the cheapest type that could have been bought by Wellspan" and was far inferior to systems used by other healthcare organizations. (*Id.*) Next, Plaintiff told the patient that he had bad news for her. (*Id.*) The patient, a breast cancer survivor, immediately became concerned. (*Id.*) Plaintiff reassured the patient that she was in fine health, but told her that "Wellspan has decided that he is too old to be working and is forcing him to retire." (*Id.*) At that point, Plaintiff launched into a diatribe about his former partners at Apple Hill claiming that they had hatched a ploy to steal that practice from him. (*Id.*)

Plaintiff also discussed his dispute with Wellspan in detail. Among other things, Plaintiff told the patient: "They want a good fight, and I told them if they want a good fight I will give them one. . . . I am suing them. . . . You keep your eyes open, it will be in the papers!" (*Id.*) He went on to describe a number of employment opportunities he was pursuing with Wellspan competitor York Memorial Hospital and others. (*Id.*) Plaintiff told the patient a number of times that he feels like he is being forced to retire because people want "what was his, and that some even want to claim his research." (*Id.*)

Before the patient's office visit was over, Plaintiff told the patient: "When I leave this room, I'll take your face sheet right here . . . and make a copy of it, along with today's notes from this visit." (*Id.*) Plaintiff then complained to the patient that his staff had once "told on him" for doing that. (*Id.*) Ms. Anthony stated that

15

Plaintiff met with the patient for about one hour, and only discussed the patient's health for approximately ten minutes of that time. (*Id.*) She wrote that Plaintiff used the exact same script with the remaining three patients he saw that day. (*Id.*)

During his deposition, Plaintiff acknowledged that he did, in fact, express a number of those sentiments to his patients that day, but accused Ms. Anthony of lying about the things he said. (Doc. 27-2 pp. 40, 42-43 of 94.) He did, however, admit that he photocopied patients' records and removed them to his home without Wellspan's permission throughout the last year of his employment. (*Id.*)

After receiving Ms. Anthony's email, Dr. Arbittier requested an investigation based on the information contained therein. (Doc. 27-3, pp. 76-77 of 85.) Wellspan's Associate General Counsel, Amy Nelson, Esquire, interviewed Plaintiff's staff and provided a summary of concerns to Dr. Arbittier. (*Id.* at 74-75 of 85.) Dr. Arbittier and Dr. McGann then spoke via telephone and collectively decided to terminate Plaintiff's employment. (*Id.* at 75 of 85; Doc. 27-2, p. 73 of 94.) On July 18, 2014, Dr. Arbittier met with Plaintiff and his wife and informed them that Plaintiff's employment was terminated. (Doc. 27-2, pp. 44-46 of 94.) Dr. Arbittier sent Plaintiff a letter on July 25, 2014, detailing the reasons for his termination, which included a violation of section 2.2.11 of the Agreement and further violations consistent with the 2013 warning letter. (*Id.* at 48 of 94; Doc. 27-3, pp. 79-80 of 85.) Dr. Arbittier concluded his letter by stating, "We appreciate

your many years of service to Wellspan and the community. It is unfortunate that your tenure with Wellspan ended in this regrettable manner." (Doc. 27-3, pp. 79-80 of 85.)

On October 10, 2014, Plaintiff filed a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Doc. 27-3, pp. 82-85 of 85.)

## B. Procedural History

Plaintiff initiated this action by filing a complaint on March 13, 2015 in the Eastern District of Pennsylvania alleging that Defendant violated the Age Discrimination and Employment Act. (Doc. 1.) More specifically, Plaintiff alleges that, in response to his refusal to retire, Defendant reduced his office staff and space, terminated his employment, and replaced him with younger physicians. (*Id.* at ¶ 22.) On May 21, 2016, the Eastern District of Pennsylvania ordered, in accordance with the parties' stipulation, that this matter be transferred to the Middle District of Pennsylvania. (Doc. 5.)

Following the close of fact discovery, Defendant filed a motion for summary judgment and a statement of facts on April 14, 2016, followed by a brief in support on April 15, 2016. (Docs. 25, 27, & 29.) Plaintiff timely filed a response, counter-statement of facts, and a brief in opposition to Defendant's motion for summary

judgment. (Docs. 33-35.) Defendant subsequently filed a reply brief on May 20, 2016. (Doc. 36.)

On August 25, 2016, Plaintiff filed a motion to amend his complaint (Doc. 51), which Defendant opposes (Doc. 55). The motion for summary judgment and motion for leave to file an amended complaint have been fully briefed and are ripe for disposition. The court will address each motion in turn.

## II.   Motion for Leave to File an Amended Complaint

Generally, leave to amend a pleading pursuant to Federal Rule of Civil Procedure 15(a) should be "freely give[n] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, a court need not grant leave to amend in the presence of bad faith, undue delay, undue prejudice, or futility. *See Diaz v. Palakovich*, 448 F. App'x 211, 215-16 (3d Cir. 2011) (citing *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000)); *see also Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993). "Delay becomes 'undue,' and thereby creates grounds for the district court to refuse leave, when it places an unwarranted burden on the court or when the plaintiff has had previous opportunities to amend." *Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 266 (3d Cir. 2008) (citation omitted). Even where there is no undue delay, prejudice to the non-moving party remains the touchstone for the denial of a motion to amend. *Arthur v. Maersk, Inc.*, 434 F.3d 196, 202 (3d Cir. 2006). The court must consider whether granting leave to amend the complaint

"would result in additional discovery, cost, and preparation to defend against new facts or new theories." *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001).

In addition to bad faith, undue delay, undue prejudice, and futility, "a court has discretion to deny an amendment if such action was done for an improper purpose." *Prescod v. Bucks County*, Civ. No. 08-cv-3778, 2009 WL 3617751, *6 (E.D. Pa. Nov. 2, 2009) (citing *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 116 (3d Cir. 2003)). Motions to amend filed after a summary judgment motion has been submitted are highly disfavored. *See Cureton*, 252 F.3d at 273. When a plaintiff files a motion to amend after the filing of a defendant's motion for summary judgment, the timing "raises an inference that the plaintiff is attempting to bolster his legal position – and therefore avoid summary judgment – by amending the complaint. This is an unacceptable reason to amend." *Fatir v. Dowdy*, Civ. No. 95-cv-0677, 2002 WL 2018824, *8 (D. Del. Sept. 4, 2002) (citing *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 806 (1st Cir. 1987)) (affirming district court's denial of leave to amend where the request to amend the complaint appeared to be "an attempt to avoid an adverse ruling on summary judgment"); *see also Reyes v. Pac. Bell*, 21 F.3d 1115, 1115 n.4 (9th Cir. 1994) ("We note also that [plaintiff]'s motion to amend his complaint was filed only after [defendant] had filed its motion for summary judgment. A motion to amend should not be used as a

way to defeat a motion for summary judgment, and thus the timing of [plaintiff]'s motion strongly supports the district court's decision to deny it.").

Here, Plaintiff requests leave to amend his complaint to add a retaliation claim because Plaintiff recently "became aware that Wellspan provided information to the Pennsylvania State Board of Medical Examiners that Plaintiff was not fit to practice medicine." (Doc. 52, pp. 4-5.) The motion for leave to amend comes months after Defendant filed its motion for summary judgment and well after discovery ended.  Plaintiff's request is an attempt to add an additional cause of action, and therefore a clear effort to avoid summary judgment.  As previously stated, such an attempt is an improper reason for amending a complaint, and Plaintiff's motion for leave to amend the complaint will be denied.

## III. <u>Motion for Summary Judgment</u>

### A. <u>Legal Standard</u>

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for the grant of summary judgment. Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law, and is "genuine" only if there is a sufficient

evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party" and draw all reasonable inferences in favor of the same. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex*, 477 U.S. at 324. "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). The non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23.

"Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

### B.   <u>Discussion</u>

Defendant sets forth two arguments in support of summary judgment: (1) that the statute of limitation bars Plaintiff's claim that Defendant refused to extend his contract past 2014; and (2) that Plaintiff cannot establish that his age was the "but for" reason that Wellspan terminated his employment

### 1.   Whether Plaintiff's contract renewal claim is time-barred

The ADEA generally requires a plaintiff to file a charge of discrimination with the EEOC within 180 days of the alleged unlawful practice. 29 U.S.C. § 626(d)(1)(A), but, in a "deferral state" such as Pennsylvania, a plaintiff has 300 days from the alleged unlawful practice to file a charge of discrimination. 29 U.S.C. § 626(d)(1)(B); *Davis v. Calgon Corp.*, 627 F.2d 674, 677 (3d Cir. 1980). This period begins to run the moment the challenged decision is "made and communicated to" plaintiff "even though one of the *effects* . . . did not occur until later." *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) (emphasis in original).

Throughout the litigation, Plaintiff has claimed that Defendant refused to extend his contract past December 31, 2014 due to his age. Defendant argues that,

although the facts are not clear regarding exactly when Plaintiff knew his contract

would not be renewed, Plaintiff knew, at the latest, on September 3, 2013 when he

sent a letter to Dr. McGann suggesting that Wellspan was refusing to extend his

contract due to his age. (Doc. 29, p. 30 of 41.) Specifically, Plaintiff stated:

> I presume that your letter of August 23 is in no way related to my earlier request for an extension of the term of my current contract past the end of the calendar year 2014. . . . it appeared to me that you had a negative approach when discussing with me, my desire to continue working for the Hospital at the end of my current Contract year. At any rate, my age appeared to be a sensitive issue for you.

(Doc. 27-3, p. 48 of 85.) Based on this letter, Defendant asserts that Plaintiff knew

his contract would not be renewed, and suspected his age played a role in that

decision, by September 3, 2013. Accordingly, Defendant argues that Plaintiff had

300 days, or until July 1, 2014, to file a charge with the EEOC related to

Wellspan's refusal to extend his contract.

Defendant further argues that, although Plaintiff's EEOC charge timely

challenged his termination, the refusal to extend Plaintiff's contract was a discrete

employment action that cannot form the basis for a continuing violation that

culminated in his termination. Instead, each discrete employment action, i.e. the

refusal to extend Plaintiff's contract and Plaintiff's termination, constituted a

separate employment action subject to its own statute of limitation period.

After a thorough review of the record in this case, is not clear exactly when, if ever, Defendant advised Plaintiff that it would not extend his contract. However, it is clear that by September 3, 2013, at the very latest, Plaintiff felt that his contract renewal request had been denied. As the refusal to renew a contract is a discrete act, Plaintiff had until July 1, 2014 to file a claim with the EEOC. Plaintiff's October 14, 2014 EEOC charge was therefore untimely insofar as it claimed that Wellspan refused to extend his contract. *Chinoy v. Pa. State Univ.*, Civ. No. 11-cv-1263, 2012 WL 727965, *5-6 (M.D. Pa. Mar. 6, 2012) (citing *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006)) (stating that the refusal to renew a contract is a discrete act that begins the relevant statute of limitations and is not a part of a continuing violation). Accordingly, the court will grant Defendant's motion for summary judgment on this claim.[5]

## 2.  Whether Plaintiff established pretext

The ADEA makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To prevail

---

[5] The court notes that, in his opposing brief Plaintiff focused entirely on whether his age was a "but for" cause of his termination and failed to address Defendant's argument that his contract renewal claim is time-barred. Because failure to address the substance of any issue "constitutes an abandonment of those causes of action and essentially acts as a waiver of these issues," *Skirpan v. Pinnacle Health Hosps.*, Civ. No. 07-cv-1703, 2010 WL 3632536, *6 (M.D. Pa. Apr. 21, 2010) (citations omitted), this alone would also be a sufficient ground upon which to grant summary judgment on this issue in Defendant's favor.

on a claim of intentional discrimination under the ADEA, "a plaintiff must show that his or her age 'actually motivated' or 'had a determinative influence on' the employer's adverse employment decision." *Fasold v. Justice*, 409 F.3d 178, 183 (3d Cir. 2005).

ADEA claims are litigated according to the burden-shifting framework developed for Title VII claims in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) (approving of the "continued application of the *McDonnell Douglas* paradigm in age discrimination cases"); *see also Wilson v. Mobilex USA Inc.*, 406 F. App'x 625, 626 (3d Cir. 2011) ("ADEA . . . claims are governed by the familiar burden-shifting framework set out in *McDonnell Douglas*."); *Fasold*, 409 F.3d at 183-84 (holding that ADEA claims proceed under the *McDonnell Douglas* framework). Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of age discrimination. *Smith*, 589 F.3d at 689. After doing so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. *Fasold*, 409 F.3d at 184. If a legitimate nondiscriminatory reason is provided, the plaintiff must present evidence to demonstrate that the defendant's proffered reasons were not its true reasons, but were merely a pretext for its illegal action. *Smith*, 589 F.3d at 691. The plaintiff can prove pretext by submitting evidence that allows a fact finder to either disbelieve the employer's

articulated legitimate justification, or to conclude that an invidious discriminatory reason was more likely than not a "but for" cause of the employment action. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *see also Keller v. Orix Credit Alliance Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (applying *Fuentes* in ADEA context). To accomplish this, a plaintiff must show that a defendant's reasons are so weak, incoherent, implausible, or inconsistent that they lack credibility. *See Fuentes*, 32 F.3d at 765. Regardless of the method, the evidence must allow a reasonable jury to find, by a preponderance of the evidence, that age discrimination was a "but for" cause for the adverse employment action. *Abels v. DISH Network Serv. LLC*, 507 F. App'x 179, 183 (3d Cir. 2012) (citing *Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 177–78 (2009)).

To establish a prima facie case of age discrimination under the ADEA, a plaintiff must satisfy four elements: (1) he is at least forty years of age; (2) he is qualified for the position in question; (3) he has suffered an adverse employment action; and (4) he has been replaced by a sufficiently younger employee to permit a reasonable inference of age discrimination. *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995). It is undisputed that Plaintiff was over the age of forty, that he was qualified for his position because he had been employed as a breast cancer surgeon for over forty years, and that he was terminated. As to the fourth element, Plaintiff claims that two younger breast cancer surgeons were hired

to do the same work as Plaintiff but is unsure if that was the reason for his termination. (Doc. 35, p. 8 of 23.) At his deposition, Plaintiff was questioned on this topic:

> Q: Was [your termination] to make room for Dr. Johnson
> and Dr. Pandelidis because they were younger?
> A: You have to ask them.
> Q: You don't know one way or the other?
> A: No.

(Doc. 27-2, p. 49 of 94.) Accordingly, it is not clear that Plaintiff can establish a prima facie case of age discrimination. However, Defendant assumes, *arguendo*, that Plaintiff can establish a prima facie case (Doc. 29, p. 33-34 of 41), and the court will likewise make this assumption.

The burden thus shifts to Defendant to articulate a legitimate, nondiscriminatory reason for terminating Plaintiff. Defendant argues that it has satisfied this burden by establishing that Plaintiff was terminated "in response to the multiple instances of unprofessional behavior that occurred over the last years of [his] employment." (*Id.* at 34 of 41.) As set forth in detail above, Defendant had to address numerous instances of unprofessional conduct on the part of Plaintiff from February 2011 until he was terminated on July 18, 2014. *See supra* Section I.A. Thus, Defendant has satisfied its burden.

Shifting the burden back to Plaintiff, he argues that a reasonable factfinder could disbelieve Defendant's articulated legitimate reasons. Specifically, Plaintiff

contends that Defendant's reliance on the February 2011 incident when he used the term "bitch" in reference to Gale Bowman is "only a poor excuse" to justify its age-related discrimination. (Doc. 35, p. 10 of 23.) While Plaintiff admits that Dr. Bornt terminated the lease after his August 16, 2013 outburst, he claims that he was not directing his anger at Gale but at Wellspan. (*Id.* at 13 of 23.) He further argues that all action taken as a result of that incident exhibits the bad faith by Wellspan "in continuing to expose [Plaintiff] to a spy program promulgated by hospital executives" in an effort to terminate his employment. (*Id.* at 11-12 of 23.) Plaintiff also attempts to create issues of material fact related to this alleged spy program. Lastly, Plaintiff admits that he removed patients' face sheets and other medical records from his office but claims that Ms. Anthony lied about most of the other matters described in her email.[6] (*Id.* at 18-19 of 23.)

None of the evidence Plaintiff presents would allow a factfinder to disbelieve Defendant's justification for termination, or conclude that Plaintiff's age was the "but for" reason for his termination. It is undisputed that the evidence shows that Plaintiff referred to Gail as a "bitch" during an argument and that Dr.

---

[6] Plaintiff also relies on the fact that he qualified for unemployment compensation "after the hospital contested it with the Bureau of Unemployment Compensation finding no just cause for the termination." (Doc. 35, p. 19 of 23.) Regardless of whether Wellspan opposed Plaintiff's application for unemployment compensation benefits, the court will not consider an administrative determination under the Pennsylvania Unemployment Compensation Law when evaluating a summary judgment motion in an employment discrimination case. *See, e.g.*, *Helfrich v. Lehigh Valley Hosp.*, Civ. No. 03-cv-5793, 2005 WL 1715689, **16-20 (E.D. Pa. July 21, 2005); *Williamson v. Penn Millers Ins., Co.*, Civ. No. 04-cv-1142, 2005 WL 3440633, **7-8 (M.D. Pa. Dec. 14, 2005.)

Bornt terminated Plaintiff's lease in response to Ms. Shields Eberly's refusal to continue working in the same office as Plaintiff. Furthermore, even if Ms. Anthony fabricated the entire description of what occurred on July 14, 2014, it is undisputed that she told Wellspan that Plaintiff was using patient consultations to disparage Wellspan and its physicians, recruit patients for a competing practice, and to copy and remove patient records. Wellspan also gave Plaintiff ample opportunity to modify his conduct. Thus, Wellspan was justified in terminating Plaintiff due to the multiple articulated legitimate reasons.

Further, it is not the court's role to "act as a super-personnel committee reviewing the decision to ensure that there was just cause for . . . termination." *Cain v. Wellspan*, Civ. No. 08-cv-1704, 2009 WL 5112352, *8 (M.D. Pa. Dec. 17, 2009) Instead, the relevant inquiry—and the one which Plaintiff as the non-moving party must come forward with evidence to support—is whether the real reason for the termination was discrimination. Plaintiff has come forward with no such evidence.

Therefore, the court will grant summary judgment in favor of Defendant as Plaintiff cannot establish pretext.

## IV.    <u>Conclusion</u>

For the reasons stated herein, Plaintiff's motion for leave to amend the complaint (Doc. 51) will be denied and Defendant's motion for summary judgment (Doc. 25) will be granted. An appropriate order will issue.

<div style="margin-left:50%;">
s/Sylvia Rambo
_____
SYLVIA H. RAMBO
United States District Judge
</div>

Dated: March 31, 2017